1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

8
9

X CORP.,

)Case No.: 1:25-cv-05068

10

)

Plaintiff,)    **MOTION TO INTERVENE**

11

-against-

) **Rule 24, Federal Rules of Civil**
)**Procedure**

12
13

LETITIA JAMES, *In Her Official*
*Capacity as Attorney General of New*
*York*,

)
)
)

14
15

Defendant.)
)

16

EMANUEL MCCRAY, *Also Known As*
*"TrumpGenius"*,

)
)
)

17
18

[Proposed] Plaintiff-Intervenor.)
)

19
20

Emanuel McCray ("McCray"), proposed Intervenor, respectfully moves to

21

intervene in this action pursuant to Rule 24 of the Federal Rules of Civil Procedure

22
23

(Fed. R. Civ. P.).

24

This Motion is accompanied by a Memorandum of Law. Pursuant to Fed. R.

25

Civ. P. 24(c), a proposed pleading that sets out the claims of the Proposed

26
27
28

1

1    Intervenor for which intervention is sought is attached and will be filed if the Court

2    grants this motion to intervene.

3

4    Respectfully submitted this 6th day of July 2025.

5

6    Emanuel McCray

7    **a/k/a "TrumpGenius"**

8    400 W McLoughlin Blvd. Apt 5
     Vancouver, WA 98660

9    (564) 208-7576

10   emanuel.mccray@hotmail.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# MEMORANDUM OF LAW

## I.    BACKGROUND.

1.    Proposed Intervenor brings a facial challenge to New York Senate Bill S895B (SB S895B), codified at Article 42 (Sections 1100–1104) of the New York General Business Law. See Proposed Intervenor's Complaint in Intervention ¶ 1, Exhibit 1.

2.    The State of New York is an independent sovereign member of the U.S. Constitution's Federal Government.[1]

3.    On July 15, 1776, New York joined the other 12 colonies in declaring independence from Great Britian. Under the Declaration of Independence, New York agreed:

> "That these United Colonies are, and of Right ought to be Free and Independent States; that they are Absolved from all Allegiance to the British Crown, and that all political connection between them and the State of Great Britain, is and ought to be totally dissolved...."[2]

4.    On July 26, 1788, New York's convention ratified the new Federal Constitution by a 30-27 vote, making it the 11th State to join the new Federal Government.[3]

5.    Plaintiff X Corp. has limited its constitutionality and legal validity challenges to three provisions of New York Senate Bill S895B, codified at Article 42 (Sections

---

[1] *Elliot, Debates,* vol. 1, pp. 327-331; *Documentary History of the Ratification of the Constitution,* vol. 23, pp. 2321-2326.
[2] *Declaration of Independence: A Transcription.* Available from https://www.archives.gov/founding-docs/declaration-transcript.
[3] Note 1, *supra.*

3

1100–1104): N.Y. Gen. Bus. Law §§ 1102(1)(c), 1102(1)(d)(i) and 1102(1)(e)

("Content Category Report Provisions"). See Plaintiff X Corp. Complaint ¶ 1,

Docket No. 1 at 1.

6.      Specifically, N.Y. Gen. Bus. Law §§ 1102(1)(c) demands that Plaintiff X

Corp. provide a statement as to whether the current version of its terms of service

includes the following subjective categories of content and the definitions of those

categories, including any subcategories:

> "(i) hate speech or racism; (ii) extremism or radicalization; (iii)
> disinformation or misinformation; (iv) harassment; and/or (v) foreign
> political interference."

7.      Plaintiff X Corp.'s limited challenges provides a strong indication that

Plaintiff X Corp. has already designed one or more artificial intelligence ("AI")

models based on high volumes of data fed to selected algorithms to help the AI

system refine itself to meet the demands of global political and criminal regimes,

persons, and systems.

8.      Proposed Intervenor's own Article III standing and standing to join with

Plaintiff X Corp. is derived from the following global censorship of Proposed

Intervenor's Twitter, now "X," and Facebook, now "Meta," social media accounts

on April 28, 2021:[4]

---

[4] Available from https://twitter.com/trumpgenius2/status/1387376613214412800. Original
article: Yaqiu Wang. *And the Oscar for Censorship Goes to Xi Jinping: Beijing-born Director*

4



9.    Beijing-born Chloe Zhao ("Zhao"), pictured above, became the "first ["Asian"] woman of color to win an Oscar for best director for her film *Nomadland*."

10.    In China, the Chinese Communist Party ("CCP") directed social media platforms to scrub news about Zhao's historic Oscar wins. The CCP took additional steps to "block a virtual private network service that some netizens used to circumvent China's Great Firewall to livestream the award ceremony."[5]

---

*Chloe Zhao's Historic Win Erased in China.* Human Rights Watch (HRW). April 26, 2021. Available from https://www.hrw.org/news/2021/04/26/and-oscar-censorship-goes-xi-jinping.
    [5] *Id.*

5

11.     Zhao's *Nomadland* film also paved the way for American actress and producer, Frances Louise McDormand, to become the first person in American history to win Academy Awards both as producer and performer for the same film; and the second woman in American history to win Best Actress three times—second only to Katharine Hepburn.[6]

12.     This tweet demonstrates the deployment of two or more "live" AI models that have been validated by "X" and "Meta" using highly curated and fit-for-purpose data sets. The Court is encouraged to grasp the constitutional importance and significance of the censorship tools already available and used to target and control Proposed Intervenor's social media speech and data.

13.     The first AI model consists of algorithms that implements the CCP's policies from Beijing that targets global human rights activists, the American Academy Awards, Chloe Zhao, TrumpGenius, disfavored speech about Xi Jinping and other curated datasets.

14.     The second AI model consists of algorithms that globally target TrumpGenius, anti-COVID-19 individuals, data and vaccines, COVID-19 conspiracy theorists, and other curated datasets. This is obvious given the fact that

---

[6] *Nomadland (film).* Wikipedia. Available from https://en.wikipedia.org/wiki/Nomadland_(film); Frances McDormand. Wikipedia. Available from https://en.wikipedia.org/wiki/Frances_McDormand; Travis Clark. *The 44 actors who have won multiple Oscars, ranked by who has won the most.* April 26, 2021. Available from https://www.businessinsider.com/actors-with-most-oscars-2018-2#frances-mcdormand-3-wins-5-nominations-43.

the operating algorithms identified the tweet regarding the Academy Awards involved "misinformation that could cause physical harm... [and] false information about COVID-19 that could contribute to physical harm."

15.    On February 28, 2025, COVID-19 class action tort claims, which covered the censorship of this tweet by X and Meta on behalf of the CCP, were received by the Office of The Honorable Pamela Jo Bondi, United States Attorney General, via USPS Tracking Number 420205309505506671715055006465.

16.    On March 3, 2025, the Office of The Honorable Kash Patel, Director Federal Bureau of Investigation, received a copy of the COVID-19 class action tort claims sent to Attorney General Bondi via USPS Tracking Number 420205359505515037425057518258.

17.    On March 5, 2025, the White House Office received a copy of the COVID-19 class action tort claims sent to Attorney General Bondi via USPS Tracking Number 420205009505506671715055006540.

18.    On April 19, 2025, President Trump's White House launched its official COVID-19 website titled *"Lab Leak: The True Origins of COVID-19."*[7] The new official claims are that "[t]he [COVID-19] virus possesses a biological characteristic that is *not found in nature*...." This White House assessment is contrary to the

---

[7] Available from https://www.whitehouse.gov/lab-leak-true-origins-of-covid-19/.

7

1  "natural origin" global AI models deployed by Twitter, Facebook, the State of New

2

3  York, and other States.

4  19.    Paragraph 109 of the 106-page research document accompanying the

5  COVID-19 class action tort claims questioned whether the New York Governor's

6

7  Emergency COVID-19 Order, which ended New York's emergency precisely on

8  November 3, 2020, and right after the 2020 Presidential Election,[8] was about the

9  "China virus" or the theft of, or interference with, the 2020 Presidential Election.

10

11  20.    Perplexity AI, a technology company that operates an AI-driven chat and

12  search tool,[9] was engaged to provide a summary and analysis of the 106-page

13  research document attached to the COVID-19 class action tort claims[10] and the

14

15  document's alignment with the White House's website titled *Lab Leak: The True*

16  *Origins of COVID-19.*

17  21.    Perplexity AI found and concluded that:[11]

18

19           "Based on the White House statement that SARS-CoV-2 possesses "a
          biological characteristic not found in nature" and the allegations in the
20           attached class action tort claim document, the claims align
          significantly.... The White House's assertion of an unnatural biological
21           characteristic directly supports the document's core argument that
          SARS-CoV-2 originated in a laboratory...rather than through natural
22

23  ────────────────────

24           [8] Available from
https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202_67.pdf.
25           [9] Available from https://www.perplexity.ai/.
           [10] The COVID-19 class action tort claims were received by the Office of The Honorable
26  Pamela Jo Bondi, United States Attorney General, on February 28, 2025 via USPS Tracking
Number 420205309505506671715055006465.
27           [11] Available from https://www.perplexity.ai/search/provide-a-summary-and-analysis-
Uo38J1POQI2efpR2g55Qmw#0.
28

zoonotic spillover.... The document explicitly frames SARS-CoV-2 as an "offensive biological weapon" deployed intentionally. The White House's description of an unnatural feature reinforces this narrative by implying human manipulation."

22.    "ChatGPT," an AI-powered chat and search tool that was launched in 2022 by OpenAI,[12] was also engaged to provide a summary and analysis of the 106-page research document attached to the COVID-19 class action tort claims.

23.    ChatGPT found and concluded that:

"The document reads more like a political manifesto than a traditional legal brief.... Some claims are supported with legitimate source citations.... Many citations link to social media posts, particularly from one user ("@trumpgenius2")....

The document makes logical leaps from historical facts to current allegations without providing conclusive evidence.... The claim attempts to reinterpret public health responses through the lens of criminal law.... It is unclear whether the arguments presented meet the legal threshold for establishing *mens rea* (intent) or causation required for such criminal charges in a civil or criminal court. It relies heavily on the interpretation of circumstantial evidence and speculative motivations....

While the document is detailed and passionate, it is unlikely to hold up under traditional standards of evidence in court unless corroborated by independent, peer-reviewed, and legally admissible evidence....

The White House statement and the attached document share a narrative root: that SARS-CoV-2 has unnatural characteristics suggesting a lab origin. But the attached document extrapolates far

---

[12] According to "TechTarget," OpenAI is an artificial intelligence research company. It was founded in 2015 by a group of entrepreneurs and researchers that included Elon Musk and Sam Altman. OpenAI is backed by several investors, with Microsoft being the most notable. OpenAI also created Dall-E, an AI text-to-art generator. Available from https://www.techtarget.com/whatis/definition/ChatGPT.

9

beyond—arguing not only for lab origin, but intentional bioweapon creation and global conspiracy. In contrast, the White House presents a cautious, politically framed hypothesis focused on lab safety oversights without attributing malicious intent."

24.     ChatGPT made several errors in its analysis and conclusions, chief among them is the fact that the 106-page research document was neither a "political manifesto" or a "legal brief," but was rather intentionally designed with highly valuable Counterintelligence- and Human Intelligence-based research using a "back office" target investigation concept.

25.     ChatGPT's biased statement regarding "whether the arguments presented [in the 106-page document] meet the legal threshold for establishing *mens rea* (intent) or causation," overlooked or failed to detect or comprehend the intent of the human coronaviruses, set forth in paragraph 1 of the 106-page document: (a) "circulation;" and (b) "bioengineered" with "a gain of function to infect humans and a gain of function to be transmitted by humans to other humans."[13]

26.     The "back office" focus of the research provided a clear and crucial insight: a family of viruses, initially "discovered by the US/UK Common Cold Unit ("CCU") in the 1960s," possessed the intent and capabilities to infect and kill human beings

---

[13] Available, by clicking on the attachment, from https://www.perplexity.ai/search/provide-a-summary-and-analysis-Uo38J1POQI2efpR2g55Qmw#0.

around the world when allowed to circulate socially or among government-licensed and sanctioned research laboratories.

27.    Human Intelligence provides a deeper understanding of intentions, alliances, strategies and internal workings of the viruses that infect and kill humans; the humans who handle them; and the political and military strategies for using these viruses as weapons commonly used and associated with biological warfare. Human Intelligence excels at providing these insights, where technical intelligence methods may be insufficient.

28.    ChatGPT also failed in its comprehension of the fact that "@trumpgenius2," https://x.com/trumpgenius2, was intentionally populated by the authors with nearly all of their research materials, which included hundreds, if not thousands of open sources and associated pages, which were reduced to the 106-page document.

29.    ChatGPT also failed in its comprehension of the fact that "@trumpgenius2," https://x.com/trumpgenius2, is also the "verified" ("blue check mark") social media account of "Emanuel McCray," who is the same individual that co-authored the 106-page research document and the same individual currently seeking intervention.

30.    New York Senate Bill S895B would require Plaintiff X Corp. to include in its required terms of service reports, a disaggregated report of "@trumpgenius2," including a detailed "user profile" of the user, "Emanuel McCray."

11

31.    The censorship of "@trumpgenius2," https://x.com/trumpgenius2, has already been accomplished by Plaintiff X Corp. and the State of New York's adoption of the global COVID-19 pandemic hoax. Litigation success in favor of Plaintiff or Defendant will not repair the irreparable harm currently existing, nor deter the threat of future irreparable harm.

32.    One of the co-authors of the 106-page research document believed ChatGPT, through the analysis provided, appeared biased due to suffering from "Trump Derangement Syndrome" ("TDS").[14]

33.    ChatGPT's heavy bias in favor of the orthodoxies of foreign powers such as the CCP, failed to process paragraphs 12-26 and 50-51 of the 106-page document linking Fauci and millions of others[15] to the orthodoxy of the CCP's United Front Work Department ("UFWD") and the COVID-19 Community Corps organized under the U.S. Department of Health and Human Services.

34.    On June 25, 2025, the U.S. Attorney for the Eastern District of New York filed a Second Superseding Indictment[16] in the United States District Court Eastern

---

[14] According to Brad Brenner, Ph.D., "Trump Derangement Syndrome" (TDS) is political slang—not a diagnosis listed in the DSM-5 or any other clinical manual. Supporters of Donald Trump coined it as a rhetorical jab, claiming critics are so blinded by dislike that they can't perceive reality." See *The Psychology of Trump Derangement Syndrome*, April 13, 2025. Available from https://therapygroupdc.com/therapist-dc-blog/the-psychology-of-trump-derangement-syndrome/.

[15] See also *"Criminal Referral to President Trump for Falsification of COVID-19 Death Certificates."* May 5, 2025. Available from https://www.perplexity.ai/search/provide-a-summary-and-analysis-2EOsOrcpT02uOm38arYrBQ#0.

[16] Available from https://www.justice.gov/usao-edny/pr/former-high-ranking-new-york-state-government-employee-and-her-husband-charged.

12

District of New York, E.D.N.Y., Docket No. 24-CR-346 (S-2) (BMC), against

Defendants Linda Sun, also known as "Wen Sun," "Ling Da Sun," and "Linda Hu"

and her husband, Chris Hu.

35.    The CCP's UFWD is the same entity, mentioned in paragraph 33, *supra*, that

is described in paragraphs 4, 55, 82, 87, 98, 100 and 105 of the Second Superseding

Indictment against Linda Sun and her husband.

36.    The U.S. Attorney alleged, among other things, that while employed by two

Governors of New York State, Linda Sun not only acted as an unregistered agent of

the government of the Chinese Communist Party and the People's Republic of

China, but also used the COVID-19 pandemic and the "China virus" to enrich

"herself to the tune of millions of dollars".

37.    Specifically, the Indictment alleged that Linda Sun, among other things:

> "[E]ngaged in numerous political activities in the interests of the PRC
> and the CCP, including blocking representatives of the Taiwanese
> government from having access to the NYS governor's office;
> changing Politician-1 and Politician-2's messaging regarding issues of
> importance to the PRC and the CCP; obtaining official NYS governor
> proclamations for PRC government representatives without proper
> authorization; attempting to facilitate a trip to the PRC by Politician-2;
> and arranging meetings for visiting delegations from the PRC
> government with NYS government officials." Second Superseding
> Indictment, paragraphs 14-21.

38.    Paragraph 105 of this Indictment provides a vivid written view of the

discipline agents of the CCP's UFWD must maintain:

"When shown a photograph from an article titled "Overseas Chinese Representatives Invited to Reception in Celebration of the 70th Anniversary of the Establishment of PRC, at the Great Hall of the People," the defendant LINDA SUN acknowledged that she was in the photograph and claimed that she was already in the PRC for a family visit and that a real estate developer from Long Island procured her a ticket for the event. However, as noted above, CC-1 had arranged for SUN to attend UFWD events in 2019, and CC-2 had made travel arrangements, including hotel accommodations."

39.    To state differently, immediately before the "China virus" was discovered in Wuhan, China, Linda Sun had a well-established relationship with the CCP's UFWD and the New York Governor's Office. The Indictment provides a back-office glimpse of how individuals working for, or with the CCP's UFWD, including U.S. citizens like Linda Sun, are not authorized nor required to tell the truth. Individuals most familiar with the true intent behind the "China virus" have not broken their silence. This silence matches the fingerprints of the CCP's UFWD and the global Communist and Socialist conspiracies.

40.    Linda Sun, from her position of power within the New York Governor's Office, was perfectly situated to engage in activities that violated the prohibitions on information gathering and transfer found in the Espionage Act (18 U.S.C. Chapter 37), in addition to her alleged violations of "Title 22, U.S.C., §§ 612(a) and 618(a)(1)."

41.    Letters to Twitter, Facebook, the FBI Director, the CCP in Beijing, China, and others requested an explanation as to how a foreign power was able to censor

and shut down the speech of an American citizen. "[F]oreign political interference" was among the content categories included under N.Y. Gen. Bus. Law §§ 1102(1)(c)(v), which is the subject of this litigation.

42.    Other than two unanswerable telephone calls originating from Beijing, China, and a letter from FBI Director Wray forwarding the inquiry to "FBI Seattle," no other response has been received regarding this grave breach of sovereignty.

43.    Twitter and Facebook have never responded to reasonable settlement offers provided to them. Their silence matches the fingerprints of the CCP's UFWD and the global Communist and Socialist conspiracies.

44.    In January 2020, Fauci, whom President Trump allowed to lead the response to the "China virus," was also providing unauthorized diplomatic services to the United Nations through his interlocking position as a member of the Board of Directors of the Global Preparedness Monitoring Board ("GPMB").[17]

45.    What New York intentionally seeks to do, indirectly, is create its own global "Social Media Users' Terms of Service" AI models that targets individuals. The State has cleverly disguised this law as "business" legislation under Article 42, Chapter 20, titled "Social Media Terms of Service."

---

[17] A World at Risk: GPMB 2019 Annual Report. Available from https://www.gpmb.org/reports/annual-report-2019; https://www.gpmb.org/docs/librariesprovider17/default-document-library/annual-reports/gpmb-2019-annualreport-en.pdf?sfvrsn=d1c9143c_30.

## II.    LEGAL STANDARD.

46.    Rule 24 of the Federal Rules of Civil Procedure governs intervention as of right and permissive intervention, see Fed. R. Civ. P. 24(a)–(b), and should be construed liberally, see 7C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1904 (3d ed. 2022); *Davis v. Smith,* 431 F. Supp. 1206, 1209 (S.D.N.Y. 1977) (noting liberal construction is appropriate with respect to Rule 24(b)), *aff'd,* 607 F.2d 535 (2d Cir. 1978)).

47.    In considering a motion to intervene, a court "must accept as true non-conclusory allegations of the motion." *SEC v. Callahan,* 2 F. Supp. 3d 427, 436 (E.D.N.Y. 2014).

48.    A district court's decision on a motion to intervene is reviewable only for an abuse of discretion. *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 799, 804 (2d Cir. 2022).

## III.    ARGUMENT.

### A.    Standing.

49.    An individual who seeks to intervene in an action must have Article III standing when they seek the same relief or go beyond that requested by the Plaintiff. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017).

50.    Article III standing requires: (1) "an injury in fact that is concrete, particularized, and actual or imminent"; (2) "that the injury was likely caused by the

16

defendant"; and (3) "that the injury would likely be redressed by judicial relief."

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (June 25, 2021) (citation

omitted). *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 (1992) (noting the

Supreme Court has "consistently held" as such).

51.    Section 1102(1)(e)(i) and (ii) of SB S895B mandates social media platforms

disclose massive amounts of "disaggregated" data and information on content that

was flagged by the social media company as content belonging to any of the

categories described in paragraph (c) of this subdivision.

52.    Section 1102(3) of SB S895B directs the New York Attorney General to

openly publish disaggregated terms of service reports:

> "The attorney general shall make all terms of service reports submitted
> pursuant to this section available to the public in a searchable
> repository on its official internet website."

**B.    Requirements To Intervene Under Fed. R. Civ. P. 24(a)(2) Are Met.**

53.    As set forth above and below, Proposed Intervenor has established that he is

entitled to intervene both as of right and on a permissive basis under Fed. R. Civ. P.

24(a)(2) and Fed. R. Civ. P. 24(b)(1)(B), respectively.

**(1)    Timeliness.**

54.    On timely motion, the court must permit anyone to intervene who "claims an

interest relating to the property or transaction that is the subject of the action, and is

so situated that disposing of the action may as a practical matter impair or impede

17

the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2).

55.    Plaintiff's Complaint was filed on June 17, 2025; electronic Summons was issued on June 18, 2025, Docket No. 8; a Notice of Appearance by Linda Fang on behalf of Defendant Letitia James was filed on June 20, 2025, Docket No. 9; a Certificate of Service of Summons and Complaint on Defendant Letitia James was filed on June 23, 2025; and on July 4, 2025, the Honorable Judge John P. Cronan extended to August 25, 2025, the time for Defendant James to answer Plaintiff X Corp.'s Complaint. Docket No. 12.

## (2)    Undue Delay or Prejudice.

56.    Intervention, if allowed, will not unduly delay or prejudice the adjudication of the original parties' rights Under Fed. R. Civ. P. 24(b)(3). No discovery or motion practice has taken place by any party. Thus, there would be no prejudice to the existing parties at this early juncture if intervention is allowed.

## (3)    Proposed Intervenor's Interests Are Significant.

57.    The People of the United States, in Order to form a more perfect Union, ordained and established a "Federal Democratic Republic" through the structure for the Constitution for the United States of America. This is the system of the Federal Government. It is democratic because the people govern themselves. It is a Republic because the Government's power is derived from its people.

18

58.    A core purpose of the system of the Federal Government is to "establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity."

59.    The Founding Fathers established three main principles on which our Government is based: Inherent rights; self-government (Government by the people); and separation of powers (branches of Government).

60.    To effectuate one of the core purposes of the Federal Constitution, a "Bill of Rights" was provided to protect individual liberties and rights.

61.    On July 15, 1776, New York and its residents joined the other Colonies and adopted the Declaration of Independence and absolved itself from all Allegiance to the British Crown.

62.    On July 26, 1788, the State of New York and its residents agreed, by the legal and political process of ratification, to become voluntary members of the Federal Government formed from the structure of the Constitution for the United States.

63.    The First Amendment provides, relevant to this action, that "Congress shall make no law . . . abridging the freedom of speech...." Through interpretation of the Fourteenth Amendment, the prohibition extends to the States as well.[18]

---

[18] *See* Bill of Rights: The Fourteenth Amendment and Incorporation; *Herbert v. Lando,* 441 U.S. 153, 168 n.16 (1979) (The First Amendment also applies to the non-legislative branches of government—to every government agency—local, state, or federal).

19

64.    Plaintiff X Corp. and the Proposed Intervenor both allege that New York

violates the First Amendment through the State's enactment of New York Senate

Bill S895B, codified at Article 42 (Sections 1100–1104) of the New York General

Business Law. See Plaintiff X's Complaint ¶ 1, Docket No. 1; Proposed

Intervenor's Complaint in Intervention ¶ 1, Exhibit 1.

65.    New York Senate Bill S895B is also eerily similar to the Crown's use of

broad "general warrants" allowing for searches and seizures of individuals, places,

or items critical of the British government. *Huckle v. Money,* 95 Eng. Rep. 768

(K.B. 1763), *aff'd* 19 Howell's State Trials 1002, 1028, 97 Eng. Rep. 1075 (K.B.

1765); *Wilkes v. Wood,* 19 How. St. Tr. 1153, 98 Eng. Rep. 489, 498-499 (1763);

*Entick v. Carrington,* 19 Howell's State Trials 1029, 95 Eng. Rep. 807, 817-818

(1765) and similar cases.

66.    The general warrant cases, like *Huckle v. Money,* 95 Eng. Rep. 768 (K.B.

1763) and others, while directly relevant to the drafting of the Fourth Amendment,

also provided less direct connections to the drafting of the First Amendment's

robust press and free speech protections. New York Senate Bill S895B infringes

upon the guarantees of the First, Fourth and Fifth Amendments of the Bill of Rights.

67.    Each citizen of the United States has a strong interest in enforcing her/his

individual rights guaranteed under the First Amendment. This litigation reaches

core principles of the First Amendment. Abridgment by the Plaintiff and the

20

Defendant is directly implicated, and in at least one case, has already occurred with the censorship of Intervenor's tweet.

### (4)    Impairment and Adequate Representation of Interests.

68.    Despite factual differences between the parties, Plaintiff X Corp. (business) and Defendant (public), a common question of law is involved in this litigation. Liberality in this District allows for intervention. *Davis v. Smith,* 431 F. Supp. 1206, 1209 (S.D.N.Y. 1977). Impairment of Intervenor's substantial legal interests and deprivation of constitutional rights is possible if intervention is denied. The stare decisis effect of judgment may also cause impairment. The minimal burden is met.

69.    The existing parties to the litigation are incapable of representing the Intervenor's personal interests. Notwithstanding the fact that Plaintiff X Corp. seeks to vindicate a "business" interest, while Defendant James seeks to enforce the "public interests" of the State of New York, both parties have already shown signs of having colluded involving the censorship of COVID-19 information disfavorable to New York, other States and the CCP, as represented by Intervenor's tweet.

77.    While Plaintiff X Corp. and Intervenor share the same ultimate objective, any identity of interest is tenuous at best given Plaintiff X Corp.'s COVID-19 censorship on behalf of New York, other States and the CCP.

71.    The Second Circuit now requires that the movant "must rebut the presumption of adequate representation by the party already in the action." *Butler,*

21

*Fitzgerald & Potter v. Sequa Corp.,* 250 F.3d 171, 179-80 (2d Cir. 2001).

"[E]vidence of collusion, adversity of interest, nonfeasance, or incompetence may

suffice to overcome the presumption of adequacy." *Id*. 250 F.3d at 180.

72.    New York, as an existing party Government entity, is also incapable of

establishing a "presumption" of adequate representation given its strong support for

censoring disfavorable COVID-19 information on social media platforms. New

York Senate Bill S895B facially infringes upon the guarantees of the First, Fourth

and Fifth Amendments with its social media reporting and its public reporting

disclosure requirements by the Attorney General. See, *United States v. City of New*

*York,* 198 F.3d 360, 367 (2d Cir. 1999) (requiring a proposed intervenor to "make a

particularly strong showing of inadequacy"); *United States v. New York State Bd. of*

*Elections,* 312 F. App'x 353, 355 (2d Cir. 2008) (applying *Butler* to affirm district

court's denial of intervention); and *U.S. Postal Serv. v. Brennan,* 579 F.2d 188, 191

(2d Cir. 1978).

73.    Overcoming these presumptions requires specific evidence of collusion,

adversity of interest, nonfeasance, or incompetence. *Butler*, 250 F.3d at 180.

Intervenor believes his tweet of April 28, 2021, is the lynchpin that supports

intervention as of right or by permission.

74.    When speech is censored, the individuals or entities performing the

censorship are called "Censors." Censorship itself can be carried out by various

actors, including governments, institutions, and even individuals through self-censorship.

75.    On April 28, 2021, the Censors attacked Intervenor's tweet about the American Academy Awards as somehow breaching the COVID-19 policies of the global conspiracy. This attack was the "essence of censorship." See *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 557-558 (1976).

76.    New York Senate Bill S895B operates as a "Censor" and government censorship. The burdens SB S895B places on social media companies converts these companies into Institutional Censors. SB S895B has the capability of causing individuals to suppress their own speech or creations to avoid the negative consequences of demonetization and other forms of negative discipline by social media companies, including being permanently banned from the platform.

77.    Indeed, on January 8, 2021, "Twitter permanently suspended the account of [@realDonaldTrump]" which was associated with then-President Trump. "[It was] what so many inside the company had long wanted to do: Ban the president."[19] Immediately after then-President Trump was banned, then-Twitter CEO Jack Dorsey expressed being under the impression (1) that he lacked power to prevent the ban and (2) that the ban had "global" implications:

---

[19] *"Why Twitter Really Banned Trump."* Available from https://docs.house.gov/meetings/IF/IF16/20230328/115561/HHRG-118-IF16-20230328-SD016.pdf; and https://www.thefp.com/p/why-twitter-really-banned-trump.

"Less than a week after Trump's ban, Dorsey wrote on Twitter that
such a ban "sets a precedent I feel is dangerous: the power an
individual or corporation has over a part of the global public
conversation.""[20]

78.    In their news article, Bari Weiss, Isaac Grafstein, Suzy Weiss, Michael

Shellenberger, Peter Savodnik and Olivia Reingold revealed, how a group of

Twitter employees suddenly, in the form of a social media coup d'état and during

the COVID-19 pandemic hoax, seized Twitter's power and used it to permanently

remove a sitting U.S. President from the Twitter platform, in part, to please

"President-Elect Biden":

"But by January 6, 2021, [Twitter] employees were organizing via
Slack, clamoring for Trump to be removed. There were dissenters
inside Twitter. "Maybe because I am from China," said one employee
on January 7, "I deeply understand how censorship can destroy the
public conversation." Voices like that one appear to have been a
distinct minority within the company. Across Slack channels, many
Twitter employees were upset that Trump hadn't been banned earlier.
"There is a lot of employee advocacy happening," wrote one Twitter
employee on January 6. "We have to do the right thing and ban this
account," said another on January 8. On that day, the Washington Post
published an open letter signed by over 300 Twitter employees to
Dorsey demanding Trump's ban. "We must examine Twitter's
complicity in what President-Elect Biden has rightly termed
insurrection," it read."[21]

79.    Because the news article paints a very dark and dangerous picture of

Twitter's back office and many of its employees, a copy of the news article

---

[20] *Id.*
[21] *Id.*

24