UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

X Corp.,

               Plaintiff,

     v.

LETITIA JAMES, in her official capacity as
Attorney General of New York,

               Defendant.

No. 25-cv-5068 (JPC)

**REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

LETITIA JAMES
 *New York State Attorney General*
28 Liberty Street
New York, New York 10005

LINDA FANG
 *Special Litigation Counsel*
    *of Counsel*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

ARGUMENT ........................................................................................................................1

I.   CONTENTS OF POLICIES AND DATA ABOUT ENFORCEMENT ARE
     FACTUAL INFORMATION ABOUT PLAINTIFF'S SERVICES AND THEIR
     DISCLOSURE IS GOVERNED BY *ZAUDERER* ...................................................1

II.  PLAINTIFF'S ARGUMENTS FOR HEIGHTENED SCRUTINY ARE
     UNAVAILING AND THE CHALLENGED REPORTING REQUIREMENTS
     SATISFY INTERMEDIATE SCRUTINY IN ANY EVENT...................................5

III. *VOLOKH* DOES NOT SUPPORT PLAINTIFF'S CLAIMS.................................10

CONCLUSION.....................................................................................................................12

CERTIFICATION OF COMPLIANCE ........................................................................13

i

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ................................................................ 4

*CompassCare v. Hochul*, 125 F.4th 49 (2d Cir. 2025) ...................................................... 3, 5

*Council for Responsible Nutrition v. James*, 159 F.4th 155 (2d Cir. 2025) .............................. 6, 9

*International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67 (2d Cir. 1996) ...................................... 8

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) ..................................................................... 6

*National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001) ................................... 1, 5, 8, 9

*National Retail Fed. v. James*, __ F. Supp. 3d __, 2025 WL 2848212 (S.D.N.Y. 2025),
    *appeal docketed*, No. 25-2818 (2d Cir. Nov. 5, 2025) .......................................................... 3, 5

*NetChoice, LLC v. Attorney Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022),
    *vacated and remanded on other grounds by*
    *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ....................................................... 2

*New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114 (2d Cir. 2009) ........ 5, 9

*Upsolve, Inc. v. James*, 155 F.4th 133 (2d Cir. 2025) .................................................................... 5

*Volokh v. James*, 148 F.4th 71 (2d Cir. 2025) ............................................................. 3, 8, 10, 11

*X Corp. v. Bonta*, 116 F.4th 888 (9th Cir. 2024) ................................................................ 3, 4, 11

**Statutes**

N.Y. Gen. Bus. Law § 1102(1)(e)(i) ................................................................................................ 4

N.Y. Gen. Bus. Law § 394-ccc(3) ................................................................................................ 10

**Regulations**

12 C.F.R. § 1016.4 ........................................................................................................................ 1

12 C.F.R. § 1026.60 ...................................................................................................................... 1

**Other Authorities**                                                                                          **Page(s)**

Andrew Gallant, *Meta's Content Policy Changes Draw Mixed Reaction
    Amid Growing Trust in Social Media for News*, CivicScience (Jan. 14, 2025) ........................ 8

Br. for Resp. NetChoice, LLC*, Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ......................... 7

Br. of Amici Curiae Electronic Frontier Foundation,
    *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ..................................................................... 9

Johnathan Yerby & Ian Vaughn, *Deliberately Confusing Language in Terms of Service and
    Privacy Policy Agreements,* Issues in Information Systems, Vol. 23, Issue 2 (2022) ............... 6

Senate's Mem. in Supp., in Bill Jacket for ch. 640, L. 2024 ......................................................... 1

**ARGUMENT**

**I.    CONTENTS OF POLICIES AND DATA ABOUT ENFORCEMENT ARE FACTUAL INFORMATION ABOUT PLAINTIFF'S SERVICES AND THEIR DISCLOSURE IS GOVERNED BY *ZAUDERER***

The challenged provisions of S895 (the "Challenged Reporting Requirements"), the statute at issue in this action, were enacted by the New York Legislature to standardize reporting of factual information about the services provided by large social media companies: specifically, the rules selected by the companies about what content is permissible on their platforms, and data about how the companies are actually enforcing those rules. Based on the Legislature's findings that voluntary disclosures by social media companies about their policies and enforcement actions were "hard to find," and "full of inconsistent and misleading" information, the Challenged Reporting Requirements mandate that companies to organize their disclosures about existing policies and enforcement outcomes by subject matter. *See* Senate's Mem. in Supp. at 2, in Bill Jacket for ch. 640, L. 2024.

These requirements are not novel but are akin to other familiar consumer-facing disclosure requirements, like those in the financial industry, for example, where companies have long been required to separately disclose key terms to consumers in a uniform fashion and in conspicuous type. *See, e.g.*, 12 C.F.R. § 1026.60(a)(2) (requiring interest rates and fees for credit card offers be made in tabular format in bold font); 12 C.F.R. § 1016.4 (mandated "clear and conspicuous notice" of privacy policies); *see also National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 116 (2d Cir. 2001) (collecting consumer disclosure mandates). Such disclosures promote transparency and consumer awareness by making it easier for consumers to find and compare key terms of commercial services without having to sift through lengthy and confusing terms of service. As the State explained in its opening brief, the Challenged Reporting Requirements are therefore

governed by—and comport with—the standards set forth in *Zauderer* for mandated disclosures of factual commercial information. *See* Def.'s Mem. of Law in Supp. (ECF No. 29) ("Def.'s Br.") at 9-17.

In its opposition, Plaintiff resists this conclusion by insisting that the Challenged Reporting Requirements go beyond mandating factual disclosures because they purportedly compel a social media company to convey the company's policy views on how to moderate content—which Plaintiff claims is "inherently controversial." *See* Pl.'s Mem. of Law in Opp. (ECF No. 30) ("Pl.'s Opp.") at 19-20. But Plaintiff has identified no legal support for its suggestion that commercial actors are exempt from having to disclose truthful information about their services merely because the services they provide may be controversial. Here, content moderation—or curation—is *the* service offered by social media platforms. A social media company's content moderation rules and policies, which inform how they curate content, are central to the platforms' ability to "develop particular market niches, foster different sorts of online communities, and promote various values and viewpoints." *NetChoice, LLC v. Attorney Gen., Fla.*, 34 F.4th 1196, 1204-05 (11th Cir. 2022), *vacated and remanded on other grounds by Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). These rules are the very core of the commercial services provided by social media companies because a platform's online community is what distinguishes one platform from another in the competitive marketplace. *See, e.g.*, *NetChoice, LLC*, 34 F.4th at 1213-14 (detailing examples of different internet platforms with different policies tailored for different targeted users).

To be sure, a social media company's decision whether to moderate a particular category of content, and if so, how that category should be defined, are informed by opinions or policy views. The same can be said for *every* rule or policy governing the use of a social media platform. But once those opinions or views have been finalized in a rule, policy, or definition, a statement

2

about whether a social media company has adopted a particular moderation rule or defined a particular term, and the contents of any such rule or definition are purely factual information that directly relate to the commercial services provided by the company. *See Volokh v. James*, 148 F.4th 71, 90-91 (2d Cir. 2025) (existence and contents of moderation policy is factual information that "relate[s] to the social media services Plaintiffs actually provide to consumers"); *National Retail Fed. v. James*, __ F. Supp. 3d __, 2025 WL 2848212, at *5-8 (S.D.N.Y. 2025) (decision of retailer whether to use consumer data and algorithms to set prices may reflect policy opinions but how prices are actually set is factual statement subject to *Zauderer*), *appeal docketed*, No. 25-2818 (2d Cir. Nov. 5, 2025). So too are the data pertaining to a platform's enforcement outcomes mandated by the Challenged Reporting Requirements. *See* Def.'s Br. at 11-12. Plaintiff's contrary arguments improperly conflate "the existence and the contents of" a platform's rule with "the policy judgment that motivated" the rule. *See CompassCare v. Hochul*, 125 F.4th 49, 65 (2d Cir. 2025). But the Second Circuit has held that these are distinct concepts under the First Amendment. *See Volokh*, 148 F.4th at 90 ("though the policies themselves might be controversial, the fact that *they are what they are* is not") (emphasis in original); *CompassCare*, 125 F.4th at 65.

In contending otherwise, Plaintiff places undue reliance on the Ninth Circuit's statement that "while a social media platform's existing [terms of service] and content moderation policies may be commercial speech, its opinions about and reasons for those policies are different in character and kind," *see* Pl.'s Opp. at 3, 13, 14, 17, 19, 20 (quoting *X Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024)). This statement does not further Plaintiff's First Amendment claim, however, because as the State previously explained, the Challenged Reporting Requirements only require disclosure of the former. *See* Def.'s Br. at 11-12. Nowhere in its opposition does Plaintiff explain how reporting on *what* its content moderation policies are with respect to particular

3

categories of content (if any) would require it to reveal its opinions and policy views informing how and why it arrived at those particular policies. And Plaintiff's opposition is entirely silent as to how data about the number of times content was flagged or actioned for violating Plaintiff's own existing rules about "Hateful Conduct" or "Abuse/Harassment," for instance, or about the number of times content was viewed by users before Plaintiff removed it, *e.g.*, N.Y. Gen. Bus. Law § 1102(1)(e)(i)(A), (B), (F), would be anything other than purely factual information about its services.[1] These failures are fatal to Plaintiff's compelled speech claim, regardless of whether this Court adopts and applies the Ninth Circuit's reasoning.

Taking Plaintiff's arguments to their logical extension, no social media company could be required to disclose any of its rules or policies governing the terms of a user's engagement, including those governing privacy or age restrictions, for example (also arguably controversial topics), as long as the company did not want to disclose it. But that is not the law. As the Supreme Court has explained, because companies have "the full panoply of protections available to its direct comments on public issues," "there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68 (1983). Plaintiff is free under the First Amendment to publicize (or not) its opinions and policy views on any topics it wishes, but it cannot use the First Amendment to transform factual information about its services into protected speech so as to resist their disclosure.

---

[1] Additionally, the data required by the Challenged Reporting Requirements are numerical and not tied to any particular posts, and thus provide no "[i]nsight into whether a social media company considers . . . a post citing rhetoric from on-campus protests to constitute hate speech" or "posts about election fraud to constitute misinformation," *X Corp.*, 116 F.4th at 902, as the Ninth Circuit erroneously determined.

## II.    PLAINTIFF'S ARGUMENTS FOR HEIGHTENED SCRUTINY ARE UNAVAILING AND THE CHALLENGED REPORTING REQUIREMENTS SATISFY INTERMEDIATE SCRUTINY IN ANY EVENT

Plaintiff is wrong in insisting that the Challenged Reporting Requirements should be subject to strict scrutiny as a content-based regulation (Pl.'s Opp. at 22-24) because they require reporting of *particular* policies (the "Enumerated Content Categories") and enforcement actions related to those policies. The same argument could be made for mandated disclosures under state law about reproductive rights, mercury content, calorie counts, or pricing practices. But in each of those cases, the courts analyzed the disclosures under *Zauderer*, eschewing the strict (or intermediate) scrutiny urged by Plaintiff, because the mandated disclosures pertained to the products or services of the respective speakers even though the disclosures were specific to subjects singled out under the respective statutes. *See CompassCare*, 125 F.4th at 64-65 (reproductive rights); *National Elec. Mfrs. Ass'n*, 272 F.3d at 114-15 (mercury content warnings for light bulbs); *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 132 (2d Cir. 2009) (calorie content of food items); *National Retail Fed.*, 2025 WL 2848212, at *4-5 (use of algorithms and consumer information to set prices).

As the Second Circuit recently explained, because strict scrutiny applies only where content-based restrictions discriminate based on "the idea or message expressed," a regulatory "classification that considers the function or purpose of the speech" does not trigger strict scrutiny. *Upsolve, Inc. v. James*, 155 F.4th 133, 142-43 (2d Cir. 2025); *see also CompassCare*, 125 F.4th at 64-65 (concluding disclosures were content-based but nonetheless applying *Zauderer*). The Challenged Reporting Requirements are not subject to heightened scrutiny because they do not discriminate based on the content of the speech: the disclosure requirements apply equally to

companies regardless of whether the companies have adopted content moderation policies on the Enumerated Content Categories, and regardless of the scope or contents of those policies (if any).

Contrary to Plaintiff's suggestion (Pl.'s Opp. at 24-27), even assuming that intermediate scrutiny applies, the State is not required to proffer affirmative evidence to satisfy its burdens under the *Central Hudson* analysis. Instead, the State may do so "by reference to studies and anecdotes as well as . . . simple common sense." *Council for Responsible Nutrition v. James*, 159 F.4th 155, 164 (2d Cir. 2025) (*quoting Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001)) (cleaned up). Ample empirical support exists for the Legislature's conclusion that finding, understanding, and comparing social media platform content moderation policies and enforcement outcomes is difficult. *See, e.g.*, Johnathan Yerby & Ian Vaughn, *Deliberately Confusing Language in Terms of Service and Privacy Policy Agreements,* Issues in Information Systems, Vol. 23, Issue 2, at 138-149 (2022), available at https://doi.org/10.48009/2_iis_2022_112 (last visited Jan. 23, 2026) (examining industry practice of using "long complicated" terms of service that are difficult for consumers to understand). Plaintiff's own policies are a good illustration: its terms of service spans 20 pages, and separately, its rules about what content is permitted and prohibited spans more than 50 pages and is comprised of over a dozen different categories (and many subcategories). *See* Def.'s Br. at 12 n.7 (citing The X Rules).

Moreover, since platforms invariably apply different labels to their categories of moderated content (Pl.'s Opp. at 10-11), it is difficult for consumers to understand what each platform may or may not moderate. For example, according to Plaintiff, it "does not currently regulate 'hate speech,' 'racism,' or 'extremism,' [but] "does regulate 'hateful conduct'," content which may encompass "hate speech," "racism," or "extremism." *See* Pl.'s Opp. at 10; Compl. ¶ 32. Review of Plaintiff's current policies further suggests its rules about "Violent and Hateful Entities,"

"Perpetrators of Violent Attacks," and "Abuse/Harassment" may also relate to hate speech, racism, and extremism. *See* The X Rules, *supra* (listing over a dozen separate categories of regulated content under "Safety" and "Authenticity," all with hyperlinks). Without standardized disclosures, consumers trying to understand Plaintiff's policy on moderating hate speech or harassment would need to read through all of Plaintiff's many rules to identify any policies potentially applicable to these topics. Against this backdrop, the Legislature reasonably mandated that covered social media companies organize and collate relevant policies in a standardized report, instead of permitting companies to continue to obscure their policies by burying them in lengthy terms of service.

Plaintiff also misses the mark in criticizing the State for failing to discuss the specific Enumerated Content Categories. *See* Pl.'s Opp. at 2. The particular subjects of the disclosures selected by the Legislature do not undermine the constitutionality of the Challenged Reporting Requirements where, as here, the mandated disclosures are rationally connected to the asserted governmental interests. It was reasonable for the Legislature to mandate that social media companies uniformly disclose which of their existing policies, if any, may fall into the Enumerated Content Categories (including hate speech, harassment, misinformation), which are among the categories of content widely regarded in the industry as being important to consumers. *See* Br. for Resp. NetChoice, LLC[2] at 1, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ("To be safe and welcoming to wide audiences, [online websites] aim to avoid having their services used to disseminate incitement to violence, promotion of dangerous pranks, crank medical cures, and harassing statements. Users and advertisers alike demand as much."); *see also Council for Responsible Nutrition*, 159 F.4th at 165 (reasonable for Legislature to regulate particular categories

---

[2] NetChoice, LLC is a trade association of online companies, of which Plaintiff is a member. *See* About Us, NetChoice, LLC, available at https://netchoice.org/about/#association-members (last visited Jan. 21, 2026).

of products where same categories are identified in relevant literature as being connected to statutory aims). Similarly, the legislative choice *not* to mandate disclosures about moderation of "kind speech" is reasonable (*cf.* Pl.'s Opp. at 22-23) where Plaintiff has not alleged—nor is there reason to think—that consumers care whether such speech is moderated.

Along these lines, Plaintiff's reliance (Pl.'s Opp. at 27) on *International Dairy Foods Association v. Amestoy*, 92 F.3d 67 (2d Cir. 1996) is misplaced. There, the Second Circuit invalidated a law that required manufacturers to disclose whether dairy products came from cows treated with synthetic growth hormone where it was "undisputed" by the government that products from cows treated with growth hormone are "indistinguishable" from those of untreated cows. *Id.* at 69. Under these facts, the court concluded that the mandated disclosure was not rationally connected to the government's proffered interest in promoting consumer awareness because there was no indication that consumers would care about the information. *Id.*; *see National Elec. Mfrs. Ass'n.*, 272 F.3d at 115 n.6 (expressly limiting *Amestoy*'s holding to the circumstance where no legitimate state interest is proffered).

Here, in contrast, the Legislature's conclusion that a platform's content moderation policies, especially those pertaining to hate speech or misinformation, are relevant to consumers is well supported. *See Volokh*, 148 F.4th at 91 (disclosing content moderation policies ensures consumers can "make more informed choices about where they spend their screen time and how to interpret the content they find on a given social media network"); *e.g.,* Andrew Gallant, *Meta's Content Policy Changes Draw Mixed Reaction Amid Growing Trust in Social Media for News*, CivicScience (Jan. 14, 2025), available at https://tinyurl.com/yeybxmnv (last visited Jan. 22, 2026) (detailing research on how content moderation policy changes affect consumer usage of platforms); Br. of Amici Curiae Electronic Frontier Foundation at 4, *Moody v. NetChoice, LLC*,

603 U.S. 707 (2024) ("Many internet users greatly benefit from moderated sites . . . Users can choose environments that shield them from certain kinds of legal speech, including hateful rhetoric and harassment. Users can choose services that attempt to filter out misinformation by relying on sources the user trusts."). As such, the Challenged Reporting Requirements are reasonably connected to the State's asserted interests in promoting transparency, consumer awareness, and in combating online harassment.

Contrary to Plaintiff's suggestion (Pl.'s Opp. at 20-21), it is permissible for the State to mandate disclosures in hopes that better informing consumers will lead them to make different decisions. Indeed, the disclosures upheld in *National Electrical Manufacturers Association* (mercury content) and in *New York State Restaurant Association* (calorie content) both sought to "better inform consumers about the products they purchase" and "encourag[e] changes in consumer behavior." *See National Elec. Mfrs. Ass'n*, 272 F.3d at 115 (mercury content warning rationally connected to government's overall goal of reducing mercury pollution); *New York State Rest. Ass'n*, 556 F.3d at 135 (calorie disclosures intended to "help consumers make informed, healthier food choices" rationally related to government interest in tackling obesity epidemic). As the Second Circuit has recognized, mandating disclosures to educate consumers about the potential harms of the products and services they select are a proper means of furthering governmental interests in reducing the incidence of harm, even where direct regulation may not be possible. *See National Elec. Mfrs. Ass'n*, 272 F.3d at 115-16. Here, the Court should "defer to the Legislature's reasonable judgment about how best to achieve" the State's asserted interests. *See Council for Responsible Nutrition*, 159 F.4th at 165; *accord National Elec. Mfrs. Ass'n*, 272 F.3d at 116.

**III.    *VOLOKH* DOES NOT SUPPORT PLAINTIFF'S CLAIMS**

Finally, as the State explained in its opening brief, Plaintiff is mistaken in contending that *Volokh* compels a different outcome. *See* Def.'s Br. at 17-20. *Volokh* concerned the constitutionality of the Hateful Conduct Law, which, as relevant here, mandates that "[e]ach social media network shall have a clear and concise policy readily available and accessible on their website and application which includes how such social media network will respond and address the reports of incidents of hateful conduct on their platform." N.Y. Gen. Bus. Law § 394-ccc(3). The *Volokh* majority found that the provision was susceptible to two potential constructions: one which dictated the *contents* of a platform's policy, and one which did not. *See Volokh*, 148 F.4th at 89 (recounting plaintiffs' argument that the law compels them to "take a position on speech the State characterizes as 'hateful conduct'" by requiring them to adopt a policy that touched on "hateful conduct."). Reasoning that the former construction was constitutionally suspect but that the latter, which only required disclosure of an online network's policies on a particular topic but did not impede on the network's ability to determine what those policies should be "would pass constitutional muster under the *Zauderer* framework," the majority certified questions about the proper construction of the statute to the New York Court of Appeals. *Id.* at 89-90.

Although the *Volokh* decision analogizes the statute in *X Corp.* to the constitutionally suspect construction of the Hateful Conduct Law, *id.* at 93, the plain text of the Challenged Reporting Requirements cannot be reconciled with the construction that the *Volokh* majority found would be subject to heightened scrutiny. To the contrary, as explained above, and as Plaintiff does not dispute (Compl. ¶ 34), the Challenged Reporting Requirements do not dictate the contents of a social media company's policies or require that a platform adopt a policy to address any of the Enumerated Content Categories. *See Volokh*, 148 F.4th at 90-91. Rather, the Challenged Reporting

10

Requirements merely require that "a company disclose[] whether it was moderating certain categories of speech," without requiring the company to "define those categories in a public report" if the company's existing policies do not already do so. *See id.* (quoting *X Corp.*, 116 F.4th at 901) (internal quotation marks omitted).

When read in conjunction with the rest of the opinion, the *Volokh* majority's brief reference to the Ninth Circuit's decision in *X Corp.* does not support Plaintiff's claim. There is no reason to think that the *Volokh* majority had cause or occasion to independently parse the text of the statute challenged in *X Corp.*—which was not before the *Volokh* court—as opposed to relying on the Ninth Circuit's (mistaken) description of what the California statute required. Indeed, reading the *Volokh* majority's reference to the *X Corp.* decision as urged by Plaintiff would render meaningless the bulk of the remainder of the opinion on the actual question before that court. *See Volokh*, 148 F.4th at 89-93. Plaintiff offers no explanation as to why this Court should disregard the *Volokh* majority's extensive discussion and explanation about why a statutory requirement that a social media network merely disclose its existing policies on a particular topic was constitutional under the *Zauderer* standards governing such disclosures. *See Volokh*, 148 F.4th at 89-93. This Court should accordingly decline to do so.

**CONCLUSION**

For the reasons set forth above and in the State's opening brief, the Court should dismiss

the complaint in its entirety with prejudice.

Dated: New York, New York
      January 23, 2026                  Respectfully submitted,

                                          LETITIA JAMES
                                          *New York State Attorney General*

                          By:      /s/ Linda Fang
                                          Linda Fang
                                          Special Litigation Counsel
                                          28 Liberty Street
                                          New York, New York 10005
                                          (212) 416-8580

12

**CERTIFICATION OF COMPLIANCE**

Pursuant to Section 2.B of the Court's Individual Rules and Practices in Civil Cases, Linda Fang, Special Litigation Counsel in the Office of the New York State Attorney General, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 3,393 words and complies with the typeface and length limits of Local Civil Rule 7.1(B)-(C).

/s/ Linda Fang

13