**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| X CORP.,<br><br>Plaintiff,<br>-against-<br><br>LETITIA JAMES, in her official capacity, as Attorney General of New York,<br><br>Defendant. | Case No. 1:25-cv-05068-JPC<br><br>**NOTICE OF APPEAL** |

Under Federal Rules of Appellate Procedure 3 and 4, notice is hereby given that Plaintiff X Corp. (hereinafter "Plaintiff-Appellant") in the above-named case hereby appeals to the United States Court of Appeals for the Second Circuit from the August 26, 2026 Opinion and Order (ECF No. 37) and August 28, 2026 Judgment (ECF No. 38) granting Defendant's Motion to Dismiss and dismissing Plaintiff-Appellant's Complaint without leave to amend for the reasons set forth in the Hon. John P. Cronan's Opinion and Order. This appeal is taken from each and every part of the August 26, 2026 Opinion and Order and the August 28, 2026 Judgment.

Dated: September 25, 2026

By: /s/ Joel Kurtzberg
CAHILL GORDON & REINDEL LLP
Joel Kurtzberg (SBN NY 2835007)
Floyd Abrams (SBN NY 1758184)
Jason Rozbruch (SBN NY 5753637)
32 Old Slip
New York, NY 10005
Phone: 212-701-3120
Facsimile: 212-269-5420
jkurtzberg@cahill.com
fabrams@cahill.com
jrozbruch@cahill.com

*Attorneys for Plaintiff X Corp.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| X CORP.,<br><br>Plaintiff,<br><br>-v-<br><br>LETITIA JAMES, *in her official capacity as Attorney General of New York*,<br><br>Defendant. | 25 Civ. 5068 (JPC)<br><br>OPINION AND ORDER |

JOHN P. CRONAN, United States District Judge:

Businesses might not always want to share every detail about the products or services they offer. But when the government requires those businesses to speak truthfully about their offerings, the First Amendment typically allows for that kind of disclosure requirement. "Such disclosure furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the 'marketplace of ideas.'" *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001).

That principle resolves this case. The State of New York requires social-media companies to disclose certain aspects of their content-moderation policies. X Corp. wants to share less of its policies than New York requires, so it invokes the First Amendment to avoid New York's requirement. But the First Amendment poses no obstacle to New York's law. Here, more speech—like sunlight—is "the best of disinfectants." *Cf.* Louis D. Brandeis, *What Publicity Can Do*, Harper's Weekly, Dec. 20, 1913, at 10. The Court thus dismisses X Corp.'s Complaint for failure to state a claim.

## I. Background

### A. Facts[1]

As the Supreme Court recently observed, "[w]ith their billions of active users, the world's major social-media companies host a staggering amount of content on their platforms." *Murthy v. Missouri*, 603 U.S. 43, 50 (2024) (internal quotation marks omitted). But "for many of these companies, . . . not everything goes," as "platforms have taken a range of actions to suppress certain categories of speech" "[u]nder their longstanding content-moderation policies." *Id.*

One such social-media company is X Corp., formerly known as Twitter. *See id.* at 50 n.1. X Corp. provides what it calls "the X Service," which is a "real-time, open, public conversation platform" allowing for the creation of "ideas and information" through "public posts" and the "discussion and debate" which follow. Compl. ¶ 14. Although the X Service purports to let users "see every side of a topic," *id.*, X Corp. has its own content-moderation policies which restrict discussion on certain topics, *see id.* ¶¶ 32-33. For instance, X Corp. admittedly regulates what it refers to as "hateful conduct" and "manipulated, or out-of-context media that may result in widespread confusion on public issues, impact public safety, or cause serious harm." *Id.*; *see* Compl., Exhs. 9 (Hateful Conduct Policy), 10 (Authenticity Policy). Other platforms take other approaches to regulating their respective content. *See, e.g.*, *Murthy*, 603 U.S. at 50 (referencing platforms' different approaches to content regulation); *Volokh v. James*, 148 F.4th 71, 92 (2d Cir. 2025) (referring to other "social media networks . . . that generally avoid regulating or removing

[1] The facts contained in this section, which are assumed true solely for purposes of this Opinion and Order, are taken from the Complaint, Dkt. 1 ("Compl."), and the exhibits attached to the Complaint. *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor").

creator content or visitor comments" (internal quotation marks omitted)).

In 2024, New York's legislature determined that "[p]latforms rarely provide detailed insight into their content moderation practices or the effectiveness of different approaches," as "reports self-issued by social media companies are hard to find," thus "making it hard to understand and compare platform policies." New York Committee Report, 2023 NY S.B. 895 (NS) (May 31, 2024). So the legislature enacted New York Senate Bill S895B (the "Act"), codified at Article 42 of the New York General Business Law ("GBL"), *see* GBL §§ 1100-1104.

The Act has three main pieces. First, it requires a "social media company" to "post terms of service for each social media platform owned or operated by the company in a manner reasonably designed to inform all users of the social media platform of the existence and contents of the terms of service." *Id.* § 1101(1); *see id.* § 1100 (defining relevant terms such as "social media company," "social media platform," and "terms of service"). X Corp. refers to this requirement as the "Terms of Service Requirement." Compl. ¶ 21. Under the Terms of Service Requirement, the "terms of service" publicly posted must "include . . . contact information for the purpose of allowing users to ask the social media company questions about the terms of service; a description of the process that users must follow to flag content, groups, or other users that they believe violate the terms of service, and the social media company's commitments on response and resolution time; and a list of potential actions the social media company may take against an item of content or a user." GBL § 1101(2).

Second, the Act requires social-media companies to semiannually "submit" to New York's "attorney general a terms of service report," *id.* § 1102(1), which X Corp. refers to as the "Terms of Service Report," Compl. ¶ 21. The Terms of Service Report, which the "attorney general shall make . . . available to the public in a searchable repository on its official internet website," must

include several items, such as a platform's "current version of the terms of service" and "a complete and detailed description of any changes to the terms of service since the previous report." GBL § 1102(1)(a)-(b), (3). X Corp. takes aim at only some of the items to be included in the Terms of Service Report. It calls those items the "Content Category Report Provisions." Compl. ¶¶ 1, 24 (citing GBL § 1102(1)(c), (1)(d)(i), (1)(e)). Under the Content Category Report Provisions, the Terms of Service Report must include:

> (c) A statement of whether the current version of the terms of service defines each of the following categories of content, and, if so, the definitions of those categories, including any subcategories:
>
> > (i) hate speech or racism;
> >
> > (ii) extremism or radicalization;
> >
> > (iii) disinformation or misinformation;
> >
> > (iv) harassment; and/or
> >
> > (v) foreign political interference.
>
> (d) A detailed description of content moderation practices used by the social media company for that platform, including, but not limited to, . . .
>
> > (i) any existing policies intended to address the categories of content described in paragraph (c) of this subdivision . . . .
>
> (e)(i) Information on content that was flagged by the social media company as content belonging to any of the categories described in paragraph (c) of this subdivision, including all of the following:
>
> > (A) the total number of flagged items of content;
> >
> > (B) the total number of actioned items of content;
> >
> > (C) the total number of actioned items of content that resulted in action taken by the social media company against the user or group of users responsible for the content;
> >
> > (D) the total number of actioned items of content that were removed, demonetized, or deprioritized by the social media company;

> (E) the number of times actioned items of content were viewed or heard by users;
>
> (F) the number of times actioned items of content were shared, and the number of users that viewed or heard the content before it was actioned; and
>
> (G) the number of times users appealed social media company actions taken on that platform and the number of reversals of social media company actions on appeal disaggregated by each type of action.

GBL § 1102(1). And in the Terms of Service Report, "[a]ll information required by" Section 1102(1)(e)(i) "shall be disaggregated into the following categories":

> (A) the category of content, including any relevant categories described in paragraph (c) of this subdivision;
>
> (B) the type of content, including, but not limited to, posts, livestreams, comments, messages, profiles of users, or groups of users;
>
> (C) the type of media of the content, including, but not limited to, text, images, livestreams, and videos;
>
> (D) how the content was flagged, including, but not limited to, flagged by company employees or contractors, flagged by artificial intelligence software, flagged by community moderators, flagged by civil society partners, and flagged by users; and
>
> (E) how the content was actioned, including, but not limited to, actioned by company employees or contractors, actioned by artificial intelligence software, actioned by community moderators, actioned by civil society partners, and actioned by users.

*Id.* § 1102(1)(e)(ii).

The third relevant piece of the Act is its enforcement mechanism for violations. Violations include failing to "timely submit" a Terms of Service Report to the New York Attorney General and "materially omit[ting] or misrepresent[ing] required information" in the Terms of Service Report, like the information required by the Content Category Report Provisions. *Id.* § 1103(1)(b). Under the Act, violators "shall be liable for a civil penalty not to exceed fifteen thousand dollars per violation per day, and may be enjoined in any court of competent jurisdiction." *Id.*

§ 1103(1)(a). In assessing the amount of a civil penalty, the court "shall consider whether the social media company has made a reasonable, good faith attempt to comply with the provisions of this article." *Id.* § 1103(1)(c). The Act further provides that when a social-media company is "determined to have violated the [Act's] provisions," the violator "shall be granted a cure period of thirty calendar days from the date of notification of such violation." *Id.* § 1103(3). "No civil penalty may be imposed against the company provided the violation is verifiably cured within the thirty-day timeframe to the satisfaction of the enforcing authority." *Id.*

**B. Procedural History**

X Corp. initiated this action against New York's Attorney General on June 17, 2025. Dkt. 1. The Complaint brings two causes of action, alleging first that the Content Category Report Provisions violate the First Amendment of the United States Constitution and Article I, Section 8 of the New York Constitution both facially and as-applied to X Corp., and second that the Content Category Report Provisions are preempted by 47 U.S.C. § 230(c)(2)(A) ("Section 230"). Compl. ¶¶ 39-68. The Complaint accordingly seeks a declaration that the Content Category Report Provisions violate those federal and state constitutional provisions both on their face and as-applied, a declaration that the Content Category Report Provisions are preempted by Section 230, and an injunction barring the New York Attorney General from enforcing the Content Category Report Provisions. *Id.* at 25 (prayer for relief).

On October 8, 2025, this Court set a briefing schedule on the Attorney General's anticipated motion to dismiss, Oct. 8, 2025 Minute Entry, and on October 14, 2025, the Court so-ordered a stipulation between the parties agreeing that the Attorney General would not enforce the Content Category Report Provisions against X Corp. until thirty days after the Court resolves the motion, Dkt. 27. Consistent with the briefing schedule, the Attorney General moved to dismiss X

Corp.'s Complaint on November 3, 2025. Dkt. 29 ("Motion"). On December 18, 2025, X Corp. responded to the motion. Dkt. 30 ("Opposition"). And on January 23, 2026, the Attorney General replied. Dkt. 31 ("Reply").

## II. Standard of Review

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although a court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

## III. Discussion

The Court addresses X Corp.'s constitutional and preemption claims in turn.

### A. The Content Category Report Provisions Satisfy the First Amendment.

X Corp. claims that the Content Category Report Provisions violate the First Amendment. Compl. ¶¶ 2, 39-55.[2] Under the First Amendment—"which applies to New York by way of the

[2] As mentioned, X Corp. also claims that the Content Category Report Provisions violate Article I, Section 8 of the New York Constitution. Compl. ¶¶ 2, 40-41 & n.8. But as the Attorney General points out, and X Corp. does not dispute, "such a claim would be barred by the Eleventh Amendment." Motion at 9 n.5 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)); *see, e.g.*, *Woe ex rel. Woe v. Cuomo*, 729 F.2d 96, 102 (2d Cir. 1984) ("[T]he Eleventh

Fourteenth Amendment['s] Due Process Clause," *Volokh*, 148 F.4th at 83—a law may not "abridg[e] the freedom of speech." U.S. Const. amend. I. To assess whether a law abridges the freedom of speech in violation of the First Amendment, courts "employ different levels of judicial scrutiny" depending on both the "type" of speech and "nature" of the law at issue. *Volokh*, 148 F.4th at 83-88 (canvassing "general principles of First Amendment law" which set out the relevant matrix of speech, laws, and resulting judicial scrutiny). So the Court must first determine what level of scrutiny to apply to the Content Category Report Provisions before determining whether they withstand the applicable level of scrutiny.

### 1. The Content Category Report Provisions Need Only Meet *Zauderer* Scrutiny.

Central to the parties' dispute is whether what is known as "*Zauderer* scrutiny" applies, under which "regulations requiring commercial disclosure of purely factual and uncontroversial information about the terms [through] which services will be available may survive constitutional scrutiny if they are reasonably related to the State's interest in preventing deception of consumers and are not unjustified or unduly burdensome." *Id.* at 85-88 (citation modified) (discussing *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), and its progeny). *Compare* Reply at 1-4 (arguing that the Content Category Report Provisions are "governed by—and comport with—the standards set forth in *Zauderer* for mandated disclosures of factual commercial information"), *and* Motion at 1, 9-17 (same), *with* Opposition at 12-22 (arguing that "*Zauderer* . . . does not apply"). *Zauderer* scrutiny, the Second Circuit recently explained, "is more relaxed than ordinary intermediate or strict scrutiny." *Volokh*, 148 F.4th at 85 n.6. That is because the "mandated disclosure of accurate, factual, commercial information does

---

Amendment bars a federal court from ordering a state official to conform his conduct to state law."). The Court thus considers only X Corp.'s federal constitutional claim, and dismisses without prejudice its claim under the New York Constitution.

not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests," and instead "promotes" and "[p]rotect[s]" the "robust and free flow of accurate information" animating the First Amendment. *Sorrell*, 272 F.3d at 114. "In such a case, then, less exacting scrutiny is required" than intermediate or strict scrutiny. *Id.*

Were intermediate scrutiny to apply, New York's law would have to "directly advance a substantial government interest and not be overly restrictive." *Volokh*, 148 F.4th at 85 (citation modified); *accord Brokamp v. James*, 66 F.4th 374, 397 (2d Cir. 2023) (similarly explaining that under intermediate scrutiny, a law must "(1) advance[] important governmental interests unrelated to the suppression of free speech and (2) . . . not burden substantially more speech than necessary to further those interests" (internal quotation marks omitted)). And strict scrutiny, of course, would pose an even higher barrier for the Attorney General to surmount, requiring the state to "show[] that the restriction on speech is justified by a compelling government interest and is narrowly drawn to serve that interest." *Volokh*, 148 F.4th at 84 (internal quotation marks omitted) (describing this standard as "difficult to withstand"). Because the Attorney General makes no effort to argue that the Content Category Report Provisions would withstand strict scrutiny, and spends little if any time addressing intermediate scrutiny were *Zauderer* review inapplicable, *see generally* Motion, the Court turns to whether the Content Category Report Provisions are indeed subject to *Zauderer* scrutiny.[3]

[3] The closest the Attorney General comes to explaining why intermediate scrutiny would apply were *Zauderer* off the table is by obliquely citing a Second Circuit decision which purportedly "appl[ied] intermediate scrutiny where disclosures 'compell[ed] speech that [went] beyond the speaker's own product or service.'" Motion at 21 (quoting *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 264 (2d Cir. 2014)). But in *Safelite*, the regulation at issue was subject to intermediate scrutiny, rather than *Zauderer* review, because it functioned as a restriction on commercial speech rather than a mandated disclosure of commercial speech. 764 F.3d at 261-64 (applying intermediate scrutiny because the regulation "prevent[ed] the speaker from making such disclosure by requiring advertisements for a competitor and thereby deter[red] helpful disclosure

*Zauderer* scrutiny "applies to regulations on commercial speech that require" a speaker to "state purely factual and uncontroversial information about the goods or services the speaker may offer." *Volokh*, 148 F.4th at 85-86 (internal quotation marks omitted). As explained in more detail, the Content Category Report Provisions fit the bill.

**i. The Content Category Report Provisions Regulate Commercial Speech.**

To distinguish "commercial from noncommercial speech," courts consider "the nature of the speech taken as a whole and the effect of the compelled statement thereon." *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 94 (2d Cir. 2010) (internal quotation marks omitted). So "[w]hile the core notion of commercial speech is speech which does no more than propose a commercial transaction," *id.* at 93 (internal quotation marks omitted), even speech which does not itself propose a commercial transaction may still be deemed commercial "based upon a number of factors, including whether the speech is an advertisement, whether the speech references a specific product, and whether the speaker has an economic motive," *Nat'l Inst. of Family & Life Advocates v. James*, 160 F.4th 360, 374 (2d Cir. 2025). Under this nuanced view, the Second Circuit has held that the disclosure of information "*in connection with* a proposed commercial transaction" is "clearly commercial speech." *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 131 (2d Cir. 2009) (internal quotation marks omitted) (emphasis added). For instance, disclosing a fast-food item's calorie content "in connection with" that item's "sale" is commercial speech. *Id.* (internal quotation marks omitted). So too with disclosing to "consumer debtors . . . basic information about bankruptcy" when dealing with "a debt relief agency providing bankruptcy

---

to consumers," so it was more like a law "restricting commercial speech" than one "mandating commercial speech disclosures" (internal quotation marks omitted)). Since *Safelite* is inapposite, the Court proceeds to the dispositive question: whether *Zauderer* scrutiny applies.

assistance." *Conn. Bar Ass'n*, 620 F.3d at 94-95. And in the social-media context, the Second Circuit has explained, the disclosure of "content moderation policies" is sufficiently connected to "the terms of the commercial transaction between the platforms and users" to be commercial speech. *Volokh*, 148 F.4th at 89-91 (internal quotation marks omitted) (explaining that such disclosures "relate to the social media services [platforms] actually provide to consumers"). By contrast, a social-media company's "*opinions about* and *reasons for* those policies" are not commercial speech. *Id.* at 93 (quoting *X Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024)).

The question, then, is whether the Content Category Report Provisions simply require the disclosure of parts of X Corp.'s content-moderation policies, or of X Corp.'s opinions about and reasons for its policies. The answer, under the Act's plain text, is the former. The Content Category Report Provisions require a "statement of whether the current version of the terms of service defines" content categories like hate speech, racism, disinformation, or misinformation *at all*, and "if so," what the *company's* "definitions of those categories" are. GBL § 1102(1)(c). On its face, then, Section 1102(1)(c) does not require a platform to affirmatively define these terms if it does not already have a definition, nor does the provision require a platform to explain the reasons for, or otherwise opine on, any definition it may have. It simply requires the social-media company to explain what, if any, definition of those content categories the company uses. The Content Category Report Provisions further require a "detailed description of content moderation practices" including "any *existing* policies intended to address" those categories. *Id.* § 1102(1)(d)(i) (emphasis added). Here, too, this provision just requires disclosing existing policies, not the reasons for or opinions about those policies. And while the Content Category Report Provisions require "[i]nformation on content that was flagged by the social media company as content belonging to any of" those content categories, "disaggregated" by "the category of

content," *id.* § 1102(1)(e), the Attorney General represents that if X Corp. "does not currently have existing policies for moderating" certain content categories "based on" X Corp.'s "*own* understandings of these terms," X Corp. "can comply" with the Content Category Report Provisions "by simply disclosing that no content was flagged or actioned falling into these categories." Motion at 11-12.

Indeed, as X Corp. freely admits in its Complaint, the Content Category Report Provisions do "not force X [Corp.] to adopt and regulate" content categories like "'hate speech,' 'racism,' 'extremism,' 'misinformation,' or 'disinformation.'" Compl. ¶ 34. They merely "requir[e] public disclosure of the content-moderation policies" it already "adhere[s] to." *Id.* Simply put, X Corp. "can adopt whatever policies [it] choose[s]," including none at all; under the Content Category Report Provisions, X Corp. "just ha[s] to disclose" any policies it adopts. *Volokh*, 148 F.4th at 90. And nowhere do the Content Category Report Provisions require X Corp. to explain why it adopted the policies it did. *See* Reply at 3-4 ("Nowhere in its opposition does [X Corp.] explain how reporting on *what* its content moderation policies are with respect to particular categories of content (if any) would require it to reveal its opinions and policy views informing how and why it arrived at those particular policies."). While X Corp. is undoubtedly correct that "[d]eciding what content should appear on a social media platform is a question that engenders considerable debate among reasonable people," Compl. ¶ 36, the same could be said of the content-moderation policies the Second Circuit explained would be commercial speech in *Volokh*, 148 F.4th at 89-90. After all, "speech does not cease to be commercial merely because it alludes to a matter of public debate." *Conn. Bar Ass'n*, 620 F.3d at 94. The compelled disclosure of X Corp.'s content-moderation policies is thus one of commercial speech.

X Corp. urges this Court to reach a very different conclusion through an unusual route. As X Corp. sees it, the Second Circuit already said the exact opposite for this exact law. *See* Opposition at 12-17. That is because the *Ninth* Circuit held that a California law—on which New York's Act was concededly "modeled," Motion at 4-5—did not compel "commercial speech" since its Content Category Report Provisions would "require a social media company to convey the company's policy views on intensely debated and politically fraught topics" and thus compel the company's "opinions about and reasons for those policies." *X Corp. v. Bonta*, 116 F.4th at 901-03 (footnote omitted). And, X Corp. maintains, the Second Circuit, in turn, has agreed that such a law as described by the Ninth Circuit would not be subject to *Zauderer* scrutiny. *See* Motion at 12-17 (discussing *Volokh*, 148 F.4th at 93-94). But X Corp.'s bank-shot theory runs afoul of how Second Circuit opinions should be read. For one, the Second Circuit decides appeals "on the basis of the specific" laws and "circumstances before [it]." *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 249 n.12 (2d Cir. 2020) (declining to consider seemingly "identical or substantially similar" agreements not actually "before" the court). At issue in *Volokh*, of course, was not the Act challenged in this case, or even its California counterpart before the court in *X Corp. v. Bonta*. For another, and relatedly, "the language of an opinion is not always to be parsed as though . . . dealing with the language of a statute." *Brown v. Davenport*, 596 U.S. 118, 141 (2022) (citation modified). So X Corp. cannot short-circuit consideration of the Content Category Report Provisions "on the basis of a handful of sentences extracted from [a] decision[] that had no reason to pass on the" statute actually before this Court. *Id.*

As the Attorney General points out, the "plain text" of New York's Content Category Report Provisions "cannot be reconciled with the construction" the Ninth Circuit gave the California equivalent and the Second Circuit referenced. Reply at 10. That plain text makes clear

that the Content Category Report Provisions simply "compel[] disclosure of content moderation policies without any requirements as to the scope or content of those policies" and do not require X Corp. to disclose "its opinions about and reasons for those policies." *Volokh*, 148 F.4th at 91, 93 (citation modified). And were there any doubt as to which side of the line the Content Category Report Provisions fall—and there is none—New York's principles of statutory construction instruct that the Act should be read to require only the disclosure of existing content-moderation policies. *See Volokh v. James*, --N.E.3d---, No. 58, 2026 WL 1790976, at *5-6 & n.5 (N.Y. Ct. App. June 23, 2026) (reaching a similar conclusion for a provision requiring social media networks to publicize a policy "which includes how such social media network will respond and address the reports of incidents of hateful conduct on their platform" (quoting GBL § 394-ccc(3)). Because X Corp.'s arguments for why the Content Category Report Provisions compel noncommercial speech ultimately rely on the Ninth Circuit's interpretation of a California law, *see* Opposition at 17-19, rather than the plain text of the New York law this Court must interpret, those arguments fail to persuade. The Content Category Report Provisions compel commercial speech. *See Volokh*, 148 F.4th at 89-90, 93.

**ii. The Content Category Report Provisions Require X Corp. to State Purely Factual and Uncontroversial Information.**

Because the Content Category Report Provisions "regulat[e] . . . commercial speech," for *Zauderer* scrutiny to apply, they must also "require" X Corp. to "state purely factual and uncontroversial information" about its "services." *Id.* at 85-86 (internal quotation marks omitted). The provisions satisfy both requirements.

The disclosures here are purely factual: the Content Category Report Provisions "merely require[] social media networks to publicly disclose their content moderation policies, whatever those policies may be, and contain[] no requirement that those policies . . . specifically address"

any particular content categories "as defined by the statute." *Id.* at 89. In other words, disclosing "content moderation policies require[s] only that social media networks make certain truthful statements concerning information material to the consumer." *Id.* at 90 (internal quotation marks omitted). X Corp. disagrees, reasoning that its content-moderation policies cannot be "purely factual" because they involve the exercise of its "discretion," "judgment," and "opinions." Opposition at 19-20. But that reasoning misses the mark. Businesses always exercise their discretion, judgment, and opinions when deciding what goods or services to offer. Burger King chooses to generally offer higher-calorie items than, say, Sweetgreen, but the "disclosure of calorie information" remains purely factual. *N.Y. State Rest. Ass'n*, 556 F.3d at 134. So too here. One social-media company may choose to regulate its platform's content differently than another, *see Murthy*, 603 U.S. at 50; *Volokh*, 148 F.4th at 92; but the disclosure of that choice is purely factual, *see Volokh*, 148 F.4th at 89-90. *See* Reply at 2-3 (acknowledging that "a social media company's decision[s] whether to moderate a particular category of content, and if so, how that category should be defined, are informed by opinions or policy views," but "a statement about whether" the company "has adopted a particular moderation rule or defined a particular term, and the contents of any such rule or definition[,] are purely factual information that directly relate to the commercial services provided by the company").

Such disclosure is also uncontroversial. Although X Corp.'s content-moderation "policies themselves might be controversial, the fact that *they are what they are* is not." *Volokh*, 148 F.4th at 90. The Content Category Report Provisions care not a whit about whether, let alone how, a social-media company actually regulates content categories like hate speech, racism, or extremism. Because they are "truly agnostic about the substance of the content moderation policy, social media

networks are not required to adopt any particular policy or to address any particular category of speech—unless the[ networks] want to." *Id.* at 91.

X Corp. challenges this premise. It complains that any disclosure would "generate public controversy," "invariably leav[ing] some set of users dissatisfied," meaning that the Content Category Report Provisions "presuppose[]" that the compelled disclosures are "controversial." Opposition at 20-21 ("[T]he statute is designed to generate public controversy about the actions of the social media companies by framing a divisive debate in such a way that will pressure the social media companies to change their content-moderation policies to align with those desired by the State."). But this complaint turns the *Zauderer* framework on its head: the exact same could be said of *any* compelled commercial disclosure. When facing the menu board at Burger King, a consumer may be shocked at how many calories are in a Whopper, and seek the Sweetgreen next door; a different consumer, hoping to fill up for the day, may wish for *more* calories, and head to Kentucky Fried Chicken for an eight-piece bucket; still a third may find the Whopper just right. None of that means that disclosing the number of calories in a Whopper is controversial. *N.Y. State Rest. Ass'n*, 556 F.3d at 134 (holding that such disclosure was uncontroversial). Content-moderation policies are no different: social-media companies take a range of approaches to content moderation, with some regulating speech on their platforms more than others. *Compare Volokh*, 148 F.4th at 92 (discussing networks that "generally avoid regulating or removing creator content or visitor comments"), *with Murthy*, 603 U.S. at 50 (describing more aggressive policies). Disclosing those approaches "allow[s] consumers to choose social media networks that align with their individual preferences regarding content moderation," resulting in "better-informed consumer choices." *Volokh*, 148 F.4th at 92. That kind of "controversy," as X Corp. styles it, is a feature of *Zauderer* and the First Amendment, not a bug. *See Sorrell*, 272 F.3d at 113-14 ("Such

disclosure furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the 'marketplace of ideas.'"). The Content Category Report Provisions thus fall within *Zauderer*'s ambit.

**iii. X Corp.'s Other Arguments for Applying Strict Scrutiny Are Unavailing.**

X Corp. offers a couple of arguments for why strict scrutiny nevertheless applies. Neither persuades. First, X Corp. argues that the Content Category Report Provisions are "content-based regulations of speech" subject to strict scrutiny. Opposition at 22; *see Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (describing the "general rule" that "content-based restrictions trigger strict scrutiny" (internal quotation marks omitted)). Although it is true that "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech," such that "laws mandating speech" are generally "content-based regulations subject to strict . . . scrutiny," the *Zauderer* framework is an "exception[] to this general rule." *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 244-45 (2d Cir. 2014) (citation modified); *accord CompassCare v. Hochul*, 125 F.4th 49, 64-65 (2d Cir. 2025) (applying *Zauderer* to "a content-based regulation of speech").[4]

Next, X Corp. asserts that the Content Category Report Provisions are "*per se* invalid" as viewpoint-based regulations "because they do not compel disclosures regarding content-moderation practices about categories that are 'positive,' but do compel such speech for categories perceived by the State to be negative—*i.e.*, about 'hate speech,' but not 'kind speech.'" Opposition at 22-23; *see Chiles*, 146 S. Ct. at 1021 (describing "regulations that discriminate based on the

---

[4] X Corp. further argues that strict scrutiny applies because the Content Category Report Provisions "interfere with the speech rights of social media platforms." Opposition at 23-24; *see Volokh*, 148 F.4th at 84 ("[A] law that dictates how to curate or compile others' speech is generally a content-based regulation subject to strict scrutiny."). But for the reasons given above, *see supra* III.A.1.i-ii, the provisions' plain text shows that they do not so interfere with X Corp.'s speech rights.

speaker's point of view" as "an egregious form of content regulation" from which governments "must nearly always abstain" (internal quotation marks omitted)). This assertion similarly fails. The *Zauderer* framework allows for the "compelling" of "'under-inclusive' factual disclosures." *N.Y. State Rest. Ass'n*, 556 F.3d at 134 (quoting *Zauderer*, 471 U.S. at 651 n.14). After all, restaurants may be compelled to disclose only the calorie content of their items; *Zauderer* scrutiny applies even if those restaurants are not compelled to disclose their items' protein or fiber content, too. *See id.* at 133-34 (applying *Zauderer* scrutiny even though restaurants did "not want to communicate to their customers that calorie amounts should be prioritized among other nutrient amounts"). Indeed, restaurants remain "free to display other nutritional information, notwithstanding the regulation's focus on calorie content." *Volokh*, 148 F.4th at 87. Here, X Corp. may be compelled to disclose whether and how it regulates hate speech, but nothing prohibits X Corp. from also disclosing whether and how it regulates kind speech. (Nor, for that matter, is X Corp. prohibited from explaining *why* it chooses to regulate content as it sees fit, even though the Content Category Report Provisions do not require it to disclose such explanations. *See supra* III.A.1.i.) That is why viewpoint discrimination and the *Zauderer* framework do not normally clash: viewpoint-based regulations usually take the form of "uneven *restriction*[*s*] on speech," which "unquestionably pose[] a threat to the free exchange of ideas," while "disclosure mandate[s], by [their] nature, impose[] no restriction whatsoever on the free flow of ideas." *Nat'l Retail Fed'n v. James*, 806 F. Supp. 3d 427, 434-35 & n.3 (S.D.N.Y. 2025) (emphasis added) (leaving open the possibility, not raised here, that "a disclosure requirement may in practice so burden a particular viewpoint or subject matter or disadvantage certain speakers so as to trigger" heightened scrutiny); *accord Zauderer*, 471 U.S. at 651 (explaining that "disclosure requirements trench much more narrowly on [a business's] interests than do flat prohibitions on speech"). Because the Content

Category Report Provisions do "not prevent" social-media companies like X Corp. from "conveying additional truthful information" about their content-moderation policies, "*Zauderer* supplies the governing standard." *Volokh*, 148 F.4th at 87 (internal quotation marks omitted).

**2. The Content Category Report Provisions Withstand *Zauderer* Scrutiny.**

Because *Zauderer* scrutiny applies, the Content Category Report Provisions "pass constitutional muster if reasonably related to the State's interest in preventing deception of consumers," or "its equivalent, the non-disclosure of information material to the consumer," and "are not unjustified or unduly burdensome." *Id.* at 85-87, 91 (internal quotation marks omitted). They satisfy this standard. "[C]ompelling disclosure of content moderation policies without any requirements as to the scope or content of those policies . . . ensure[s] that users are fully informed about the terms of their engagement with a social media network, enabling them to make more informed choices about where they spend their screen time and how to interpret the content they find on a given social media network." *Id.* at 91. *Contra* Opposition at 27 ("Nor is the governmental interest cited—providing transparency to allow consumers to make informed choices about social media use—sufficient to satisfy *Zauderer* review."). X Corp. faults the Attorney General for "fail[ing] to show that consumers are unable to make informed choices now about social media use or that current information about content-moderation policies is lacking in any way," Opposition at 26-27, but New York's legislature rationally determined that "reports self-issued by social media companies are hard to find," thus "making it hard" for consumers "to understand and compare platform policies," New York Committee Report, 2023 NY S.B. 895. By funneling content-moderation policies into a standardized, publicly accessible Terms of Service Report, *see* GBL § 1102, the "rationality" of the Content Category Report Provisions' compelled

disclosures can be determined without "demand[ing] evidence or empirical data," *Conn. Bar Ass'n*, 620 F.3d at 97-98 (internal quotation marks omitted).

X Corp. also argues that the Content Category Report Provisions are unjustified and unduly burdensome in two ways, although both arguments fail. X Corp.'s first argument—that the Content Category Report Provisions "pressure [X Corp.] and the other platforms to moderate particular content disapproved of by the State, thereby interfering with their protected editorial speech rights," Opposition at 27-28—is simply a rehash of its assertion that its compelled disclosures are controversial because some users may be dissatisfied with them. *See supra* III.A.1.ii. To return to the calorie analogy just once more, requiring the disclosure of caloric content is not unjustified and unduly burdensome simply because the State would prefer that "consumers make informed, healthier food choices." *N.Y. State Rest. Ass'n*, 556 F.3d at 134-36; *accord Sorrell*, 272 F.3d at 115 ("Although the overall goal of the statute is plainly to reduce the amount of mercury released into the environment, it is inextricably intertwined with the goal of increasing consumer awareness of the presence of mercury in a variety of products."). Under the *Zauderer* framework, the State may mandate disclosures in the hopes that better informed consumers will make different decisions. *See* Reply at 9. So long as those decisions are left up to the marketplace, the First Amendment's "marketplace of ideas" is not offended. *Sorrell*, 272 F.3d at 114. And finally, X Corp.'s argument that the Content Category Report Provisions are unduly burdensome "because they chill the protected speech of social media platform *users*," Opposition at 28, is "entirely speculative," *Nat'l Retail Fed'n*, 806 F. Supp. 3d at 436 (similarly rejecting "assertions about how consumers will react to the disclosure" at issue).

Because the Content Category Report Provisions satisfy *Zauderer* scrutiny, X Corp.'s First Amendment claim falls short. And X Corp. makes no arguments for why any facial challenge to

the Content Category Report Provisions would succeed should its as-applied challenge fail. *See* Opposition at 28-29. As the Content Category Report Provisions "survive[ *Zauderer*] scrutiny both on [their] face and as applied," the Court dismisses X Corp.'s First Amendment claim with prejudice. *Brokamp*, 66 F.4th at 403.

**B. Section 230 Does Not Preempt the Content Category Report Provisions.**

X Corp.'s Section 230 claim also fails. Section 230 immunizes a "provider" of "an interactive computer service" like X Corp. from "any action voluntarily taken in good faith to *restrict access to or availability of material* that the provider . . . considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c)(2)(A) (emphasis added). While "[n]o cause of action may be brought and no liability may be imposed under any State . . . law that is inconsistent" with Section 230, Section 230 makes clear that it does not "prevent" a "State" from "enforcing any State law that is consistent" with it. *Id.* § 230(e)(3).

The Content Category Report Provisions are consistent with Section 230, and are thus not preempted by that provision. Under the Content Category Report Provisions, social-media companies are liable for "materially omit[ting] or misrepresent[ing] required information" in the Terms of Service Report, GBL § 1103(1)(b)(iii), but those companies remain completely free to restrict the access to and availability of material on their platforms as they see fit, *see* Compl. ¶ 34 ("[T]he law does not force X [Corp.] to adopt and regulate 'hate speech,' 'racism,' 'extremism,' misinformation,' or 'disinformation.'"). The Content Category Report Provisions do "not provide for any potential liability stemming from a company's content moderation activities *per se*," meaning that they are "not inconsistent with section 230(c)." *X Corp. v. Bonta*, No. 2:23-cv-01939 WBS, 2023 WL 8948286, at *3 (E.D. Cal. Dec. 28, 2023), *rev'd and remanded on other grounds*

*by* 116 F.4th 888. X Corp.'s argument that the State's "[i]ndirect efforts" to "influence content-moderation decisions through public pressure violate Section 230, just as they violate the First Amendment," Opposition at 29-30 (citation modified), lacks merit for Section 230 just as much as it does for the First Amendment, *see supra* III.A. Indeed, were X Corp. correct, Section 230's provision that States may "enforc[e]" laws "consistent" with its terms would be superfluous, as any indirect regulation leaving content-moderation choices up to the marketplace would be "inconsistent" with Section 230, 47 U.S.C. § 230(e)(3), and other laws would simply be unrelated. The Court thus dismisses X Corp.'s Section 230 claim with prejudice, too.

## IV. Conclusion

For the above reasons, the Court grants the Attorney General's motion to dismiss and dismisses the Complaint without leave to amend. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request [for leave to amend] that was not made."). The Clerk of Court is respectfully directed to enter judgment in Defendant's favor and to close this case.

SO ORDERED.

Dated: August 26, 2026
New York, New York

JOHN P. CRONAN
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------X
X CORP,

Plaintiff,

25 **CIVIL** 5068 (JPC)

-against-

**JUDGMENT**

LETITIA JAMES, in her official capacity as Attorney General of New York,

Defendant.
--------------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons set forth in the Court's Opinion and Order dated August 26, 2026, the Attorney General's motion to dismiss is GRANTED and the Complaint is DISMISSED without leave to amend. Accordingly, judgment is hereby entered in favor of Defendant and this case is closed.

**Dated:** New York, New York

August 28, 2026

**TAMMI M. HELLWIG**

______________________________
**Clerk of Court**

**BY:** ______________________________
**Deputy Clerk**